BRYAN, Judge.
This is an adoption case in which A.E.C. (“the birth mother”) appeals the Jefferson Probate Court’s denial of the contest she filed challenging the adoption of A.J.M. (“the child”) by J.R.M., Jr., and J.A.M. (“the adoptive parents”). The birth mother’s contest and appeal are based, in large part, on her assertion that the prebirth-consent form used for the adoption is invalid.
On September 7, 2006, Jefferson County Probate Judge Mark Gaines signed an order confirming the prebirth consent for adoption signed by the birth mother.[1] The order states, in part, that
“the Court having explained the legal effects of the execution of the consent/relinquishment herein, and of the time limits and procedures for withdrawal of the said consen t/relinquishment and the Court having provided the aforesaid expectant mother with a form for withdrawing the consent/relinquishment in accordance with Section[s] 26-10A-13[, Ala.Code 1975,] and 26-10A-14[, Ala.Code 1975], and the Court being satisfied that the aforesaid expectant parent fully understands the consent/relinquishment herein, and ha[s] executed it voluntarily and unequivocally .... ”
The birth mother signed the consent form, which stated in part:
“2. I am executing this document voluntarily and unequivocally thereby consenting to the adoption of said minor;
“3. I understand that by signing this document and the subsequent court order to ratify the consent, I will forfeit all rights and obligations to said minor unless said petitioner is my spouse; and that I understand the consent to adoption and execute it freely and voluntarily;
“4. I understand that the consent to adoption may be irrevocable, and I should not execute it if I need or desire psychological or legal advice, guidance or counseling;
[[Image here]]
“8. I understand that notice of withdrawal of consent must be mailed to the Probate Court of Jefferson County ... and that such withdrawal must be mailed within five days after birth of said minor or the execution of this document, whichever comes last....”
The birth mother signed an affidavit on September 7, 2006, stating that she had “received no money or other things of value or been paid for giving the said minor up for adoption.” Likewise, the adoptive parents signed an affidavit stating that they had “paid no money or other things of value to any party in connection with this adoption proceeding except that which has been approved by the Court.”[2]
The child was born on December 20, 2006. On December 22, 2006, the adoptive parents took custody of the child at the hospital where the birth mother had delivered the child. The adoptive parents filed *485 a petition for adoption on January 2, 2007. Also on January 2, 2007, 13 days after the child was born, the birth mother filed a petition to withdraw her consent for adoption.
On January 17, 2007, the probate court held an ore tenus hearing on the birth mother’s petition to withdraw consent; the probate court denied the birth mother’s petition because it was fatally defective in that it was not witnessed by two witnesses as required by § 26-10A-14(c), Ala.Code 1975.[3] The birth mother filed a petition to contest the adoption on January 24, 2007.
On February, 16, 2007, the birth mother filed a motion for relief from the order dated January 17, 2007; the birth mother simultaneously filed a motion to alter, amend, or vacate the court’s order of January 17, 2007. In both, motions, the birth mother alleged that she gave two forms to the probate-court clerk in an attempt to withdraw her consent for adoption; however, she alleged, the probate-court clerk told the birth mother that she did not need to file the second form, which contained the signatures of two witnesses, as is required by § 26-10A-14(c). On June 4, 2007, the probate court granted the birth mother’s motions and scheduled a hearing on the birth mother’s petition to withdraw consent and her adoption-contest petition, pursuant to § 26-10A-24, Ala.Code 1975.[4]
In the adoption-contest petition, the birth mother alleged that the adoptive parents had obtained her consent for the adoption by fraud, duress, mistake, or undue influence, and that, therefore, her consent is invalid pursuant to § 26-10A-14(a)(2), Ala.Code 1975. The birth mother further alleged that R.S., a family friend of the birth mother’s, was the agent of the adoptive parents and was also a perpetrator of the alleged fraud, duress, mistake, or undue influence.
On or about July 16, 2007, the birth mother requested visitation with the child. The probate court judge stated that Alabama’s Adoption Code, § 26-10A-1 et seq., Ala.Code 1975 (“the Adoption Code”), did not prescribe visitation with a natural parent, and he refused to grant visitation rights to the birth mother.
On August 15, 2007, the birth mother filed an amendment to her adoption-contest petition, alleging that § 26-10A-12, Ala.Code 1975, as applied in this case, deprived the birth mother of her constitutional due-process rights under the Fourteenth Amendment to the United States Constitution because, she said, the consent-for-adoption form she signed failed to give notice of all the withdrawal provisions contained in § 26-10A-13, Ala.Code 1975.[5]
*486 The probate court conducted an ore ten-us hearing on the birth mother’s withdrawal of consent and adoption contest over seven days during April and June 2008. On October 18, 2008, the probate court held that adoption of the child by the adoptive parents was in the best interest of the child; that § 26-10A-12 and § 26-10A-13 were not unconstitutional; and that “undue influence was not manifested by [R.S.] or any other person.” Thus, the probate court denied the adoption contest filed by the birth mother. The birth mother did not file any postjudgment motions. She filed her notice of appeal to this court on October 16, 2008.
The birth mother brings several issues on appeal. First, the birth mother argues that the prebirth consent for adoption was invalid, for the following reasons: 1) § 26-10A-12, Ala.Code 1975, is unconstitutional,[6] 2) the probate court should have appointed a guardian ad litem (“GAL”) on behalf of the birth mother, and 3) the consent of the birth mother was obtained by fraud, duress, mistake, or undue influence. The birth mother further argues that the probate court erred in finding that R.S. was not the agent of the adoptive parents, that the probate court erred in failing to award visitation with the child to the birth mother, that the probate court erred in finding that gifts given to the birth mother by the adoptive parents were a “non-issue,” and that the probate court erred when it allowed the testimony of the adoptive parents’ expert, Dr. Karen Turnbow.
“ ‘Where a probate court hears ore tenus evidence on a petition for adoption, its findings and conclusions based on that evidence are presumed to be correct.’ K.P. v. G.C., 870 So.2d 751, 757 (Ala.Civ.App.2003). The ore tenus presumption of correctness arises because the trial court is in a position to observe the demeanor and behavior of the witnesses and is thus able to evaluate whether their testimony is credible and truthful. Ex parte Fann, 810 So.2d 631, 633 (Ala.2001); Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996). The trial court is able to make personal observations of the witnesses, while an appellate court has the benefit only of a cold transcript of the proceedings. Thus, neither this Court nor the Court of Civil Appeals may reweigh the evidence or sit in judgment of disputed evidence presented ore tenus, Ex parte Bryowsky, 676 So.2d at 1324-1326, and the trial court’s judgment based on ore tenus evidence will not be disturbed unless it is palpably wrong, manifestly unjust, or without supporting evidence. Samek v. Sanders, 788 So.2d 872, 876 (Ala.2000).”
Ex parte J.W.B., 933 So.2d 1081, 1087 (Ala.2005).
Further, our supreme court set forth the applicable standard of review of constitutional challenges in State ex rel. King v. Morton, 955 So.2d 1012, 1017 (Ala.2006), as follows: ‘“Our review of constitutional challenges to legislative enactments is de novo.’ Richards v. Izzi, 819 So.2d 25, 29 n. *487 3 (Ala.2001). Additionally, acts of the legislature are presumed constitutional. State v. Alabama Mun. Ins. Corp., 730 So.2d 107, 110 (Ala.1998).”
The probate court gave a detailed summary of its specific findings of fact in its final order as follows:
“The sworn testimony from the birth mother is that she began using illegal drugs when she was 16 yeárs of age. She used marijuana, cocaine, prescription pills (Xanax), LSD and ecstasy. By the time she became pregnant, she testified that she had been sexually active with ten men. The birth mother attempted suicide twice, in March and April, 2003, and cut herself with scissors when she was 16. As a teenager she told her parents that she was hearing voices, but now says that was not true. She testified that she was reaching out for attention. Upon learning that she was pregnant in May, 2006, her testimony was that she immediately stopped using all illegal substances. This appears to be undisputed.
“Her parents were having marital problems when [the birth mother] learned she was pregnant. Two days after finding out she was pregnant [the birth mother] moved back in with her parents; however, two days later her mother and younger sister moved out. [The birth mother] testified that her parents told her she needed to give up her baby for adoption. She also testified that her mother and father informed her that ‘it would be better if she found somewhere to live.’
“On or about May 30, 2006, [the birth mother] had a meeting with [R.S.], who was a longtime friend of [the birth mother’s parents. [The birth mother] has known [R.S.] since she was in the second grade. [R.S.] testified that he has known the birth mother’s father for 42 years. Through the years the two families went on vacations to the beach and to Disney World together. She recalls that [R.S.] informed her that he knew a wonderful couple who were looking to adopt a child.
“[The birth mother]’s father lost his job at some point in time and on or about June 16, 2006, he was admitted to a Birmingham hospital. Upon being released from the hospital after one week, her dad took her to Lifeline Village, a home for unwed mothers in St. Clair County, but she did not wish to stay there.
“At this point, the birth mother’s mom and younger sister were living in an apartment together, and her dad was still not doing well. [R.S.] attempted to arrange living arrangements for [the birth mother] with a couple and their daughter but that fell through. Finally, in early July, 2006, the birth mother moved in with [R.S.] and his wife and their daughter.
“[The birth mother] contends that [R.S.] exerted undue influence over her. Shortly after moving in with [R.S. and his wife] and their daughter, [the birth mother] went to Gulf Shores with them. [R.S. and his wife] paid for everything. The ... daughter and the ... son [of R.S. and his wife] and [the son’s] girlfriend were also at the beach with them. [The birth mother] also contends that [R.S.] was an agent of either the adoptive parents, the birth mother’s family or some group of people who were in favor of the adoption.
“A petition for pre-approval of fees was filed and the Court approved the payment in the amount of $798.00 for the adoptive parents to remit each month. [The birth mother] testified that the monthly payment was made to [R.S.], and he used the funds to pay her *488 automobile note, cell phone and other bills. [The birth mother] was given the remainder as an allowance. The birth mother testified that she felt ‘controlled’ by [R.S.] during the months she lived with his family from July, 2006 through November 29, 2006. Beginning in August or September, [the birth mother] began spending weekends with her mother. Later, on or about November 29, 2006, she left [R.SJ’s home and moved in with her mother with whom she now has a good relationship.
“[The birth mother] and [R.S.] both testified that he solicited some contributions from men at his church, in November, 2006, to assist [the birth mother’s dad financially. [R.S.] also paid the tuition for [the birth mother]’s sister to continue attending ... School when she was a senior (which was in 2006 while [the birth mother] was residing with [R.S. and his] family). The tuition paid by [R.S.] was in the range of $6,000.00.
“[R.S.] has been active in his church for many years. He has known [the birth mother] and her dad and mom and sister for years. [The birth mother] grew up referring to [R.S.] as ‘Mr. B[.]’. [R.S.] has a long history of church and prison fellowship work. He testified that he made charitable contributions of $50,000.00 — $60,000.00 in 2007.
“[R.S.] testified that he never encouraged [the birth mother] to proceed with the adoption. He saw [the birth mother] after the delivery, and did not see any signs that [she] was having second thoughts. [R.S.] had supper with [the birth mother] on December 29, 2006, and he doesn’t remember her saying anything about changing her mind.
“[The birth mother] testified that [R.S.] and her dad were with her in the courtroom at the Pre-Birth Consent hearing before Probate Judge Mark Gaines. [The birth mother] testified that she began crying during the hearing. After a short break, she testified that Judge Gaines told her how proud he was of her, and that the baby would be taken care of. The attorney for [the birth mother] has raised the issue of the insufficiency of the wording in the execution of the prebirth consent. Through her attorney, [the birth mother] believes the ‘defect’ rises to the level of being unconstitutional.
[[Image here]]
“[The birth mother] is now attending [a] Community College and she lives with her mother and her sister. She testified that she is making good grades, and has taken parenting classes.
“The background on the adoptive parents, J.A.M. and J.R.M., Jr., is as follows: J.A.M., the adoptive mother, completed her education in 2000, in the field of occupational therapy. At the present time she does not work outside the home. J.A.M. was diagnosed with rheumatoid arthritis in 1997, which is controlled by medication. J.A.M. and J.R.M., Jr. were married in 2001. Her mom and dad reside in Virginia.
“J.R.M. Jr., the adoptive father, graduated from ... University, was honorably discharged as a Naval Officer, earned a graduate degree, and works in Birmingham where he was raised. The adoptive parents testified that neither has been arrested, received psychiatric treatment, or used illegal drugs. The parents of the adoptive father reside in Birmingham, and the parents of the adoptive mother visit from Virginia whenever possible.
“The birth mother’s OB-GYN, Dr. Ceciha Stradtman, testified during the hearing. Dr. Stradtman met with [the birth mother] on June 19, 2006, and said that [the birth mother] planned to give *489 her child up for adoption from the beginning. Dr. Stradtman testified that the adoptive mother was a patient of hers in the past, and the birth mother’s mother is a patient of hers and a friend. Dr. Stradtman said that [the birth mother] was emotional throughout the pregnancy but ‘did quite well’. [The birth mother] was not under the influence of illegal drugs, and she was mentally competent during the pregnancy. Dr. Stradtman testified that during the pregnancy [the birth mother] did not mention any reservations about giving up the baby. She felt like [the birth mother] was making the decision with a clear mind and, while pregnant, wanted to do everything right for her baby. [The birth mother] never voiced any doubts to her, pre-birth, about the adoption. Dr. Stradtman delivered the baby on December 20, 2006. The doctor said that [the birth mother] was very emotional, post-birth.
“A child psychologist, Dr. Karen Turnbow, also testified at the hearing. Dr. Turnbow testified that ‘attachment develops most strongly over an extended period of time.’ She said that attachment refers to a child’s feelings toward parents. In positive attachment there is an impact throughout life. The majority of development occurs during the first year of life. The quality of care is the determining factor in a child’s first year, not whether the caregiver is the birth mother or adoptive mother and father. An infant relates by smell, touch, sound, and a broad spectrum of factors. Dr. Turnbow said that stability needs to be preserved for an infant. She stated that if an infant has positively attached to the caregivers, then, in that event, an infant would grieve and have a painful emotional response for the rest of its life were it removed from the caregivers.
“The attorney for [the birth mother] brought up the fact that the adoptive parents gave gifts to the birth mother during the pregnancy. The testimony and evidence were that the adoptive mother first met the birth mother in the hospital, post-birth, on December 22, 2006; however, a gift bag with candy, snacks, and school supplies was delivered to her in August, 2006, a pumpkin container with candy and snacks was delivered to her in October, 2006, a birthday card with Bath & Bodyworks lotion was delivered in November, 2006, a candle was delivered in December, 2006, and flowers were delivered, post-birth, to [the birth mother] in the hospital. The total cost of the items was slightly less than $112.00, with the flowers being the most expensive at a cost of $43.60.
“§ 26-10A-24 Code of Alabama 1975, says:
“ ‘(a) whenever a motion contesting the adoption is filed, the court shall set the matter for a contested hearing to determine:
“‘(1) whether the best interests of the adoptee will be served by the adoption;’
“The birth mother is a young woman who made some poor lifestyle choices prior to becoming pregnant. After-wards, during the most crucial time in her life, her parents’ marital discord reached a crescendo. Her mother and sister moved out and her father, having experienced job related and marital problems, was hospitalized. There was no safety net for [the birth mother]. The closest substitute was [R.S.].
“The birth mother has, it appears, matured and her life is more stable than it was in 2006.
“The adoptive parents are a little older than the birth mother, and they have maintained responsible, stable lives both *490 prior to and since their marriage in 2001.
“Regarding the issue of the constitutionality of the pre-birth consent language, the Court will note that the language in question is set forth in § 26-10A-12, Code of Alabama, 1975, and was strictly adhered to in the case at hand. Attorney Bryant A. Whitmire, Jr. stated that he explained the five day/fourteen day distinction, and the best interests standard to [the birth mother] prior to the Pre-Birth Consent hearing, and that Judge Gaines explained § 26-10A-13 to [the birth mother] at the Pre-Birth Consent hearing.
“ § 26-10A-13 reads as follows:
“‘(a) A consent or relinquishment may be taken at any time, except that once signed or confirmed, may be withdrawn within five days after birth or within five days after signing of the consent or relinquishment, whichever comes last.
‘“(b) Consent or relinquishment can be withdrawn if the court finds that the withdrawal is reasonable under the circumstances and consistent with the best interest of the child within 14 days after the birth of the child or 14 days after the signing of the consent or relinquishment, whichever comes last.’
“The Court does not find § 26-10A-12 or § 26-10A-13 Code of Alabama, 1975, to be unconstitutional.
“The various connections between ... churches is interesting; however, with this being a private adoption which began within the ... community, it would follow that friendships would be intertwined in this matter. The breadth of the connections may be a bit unusual but the Court does not believe the interrelationships to be anything other than a series of circumstances. The ... Church issue does not support a conspiracy or support the presence of undue influence.
“The Court considers the candy and snacks to be a non-issue. The adoptive mother was merely attempting to be kind and supportive during the pregnancy, nothing more.
“[The birth mother] contends that [R.S.] exerted undue influence over her. Yet, [the birth mother], who was an adult, began spending weekends with her mother in August/September, and moved out of the [S.] residence on or about November 29, 2006, to live full time with her mother. [The birth mother] was not around [R.S.] for three weeks immediately prior to the birth. [R.S.] visited [the birth mother] in the hospital on the day of delivery, December 20, 2006, but he was not present on December 22, 2006, which was the day of the hand-off of the baby at the hospital from [the birth mother] to the adoptive parents. Regarding the agency contention, the court finds that [R.S.] was not working on behalf of anybody. At the time of the pregnancy, [R.S.] had known the birth mother for over a decade, and was a longtime friend of her dad and mom. [R.S.] was only trying to be helpful in the face of less than the best of circumstances. The Court finds that no other person or groups of persons were involved in any agency relationship.in any way.”
I. Validity of the Prebirth^Consent-for-Adoption Foivn
A. Constitutionality of § 26-10A-12
The birth mother argues that § 26-10A-12 is unconstitutional because the consent-for-adoption form found within that section failed to give her adequate notice of all the provisions for withdrawal *491 of her consent, specifically, the provision found in § 26-10A-13(b), Ala.Code 1975.
Section 26-10A-13 sets forth the time limits for withdrawal of consent for adoption as follows:
“(a) A consent or relinquishment may be taken at any time, except that once signed or confirmed, may be withdrawn within five days after birth or within five days after signing of the consent or relinquishment, whichever comes last.
“(b) Consent or relinquishment can be withdrawn if the court finds that the withdrawal is reasonable under the circumstances and consistent with the best interest of the child within 14 days after the birth of the child or within 14 days after signing of the consent or relinquishment, whichever comes last.”
Section 26-10A-12 states, in pertinent part:
“(a) A consent of the natural mother taken prior to the birth of a child shall be signed or confirmed before a judge of probate. At the time of taking the consent the judge shall explain to the consenting parent the legal effect of signing the document and the time limits and procedures for withdrawal of the consent and shall provide the parent with a form for withdrawing the consent in accordance with the requirements of Sections 26-10A-13 and 26-10A-14.
[[Image here]]
“(c) Except as otherwise provided in subsection (d), the form for the consent or relinquishment or the withdrawal of the consent or relinquishment shall state in substantially the same form as follows:
[[Image here]]
“‘8. I understand that notice of withdrawal of [consent] [relinquishment] must be mailed to [_ (county where consent or petition is filed if known), Probate Court at the following address _] or [_ (name and address of agency with whom document is filed or the _] petitioners or their attorney if county where petition is filed is unknown) and that such withdrawal must be mailed within five days after the birth of said minor or the execution of this document whichever comes last.’ ”
(Emphasis added.)
The birth mother argues that the consent form she signed is constitutionally defective because it gave written notice of only the withdrawal provision of § 26-10A-13(a), the five-day withdrawal provision, but failed to give notice in writing of the withdrawal provision of § 26-10A-13(b), the option to withdraw consent for adoption after the fifth day following the birth of the child.
The probate court in its final order specifically found that Judge Gaines had explained § 26-10A-13 to the birth mother at the prebirth-consent hearing. That finding is supported by the testimony of the birth mother; she testified that Judge Gaines, during the prebirth-consent hearing,
“said that I had five days no questions asked, and then 9 days after those five to file my petition and you bring it up, and at that point you had to have a petition that had to be signed and filed by a certain time by the time the courthouse closed.”
Then, the birth mother stated that Judge Gaines had told her that after five days a different standard would apply, i.e., the best-interest standard, to determine what would be best for the child.
The birth mother also testified that she met with Francis Waller, a social worker, *492 on August 25, 2006, before the prebirth-consent hearing. At that meeting, the birth mother signed a form that contained six statements. The birth mother testified that Waller reviewed the form with her. Two of the statements discussed the times for withdrawal, as follows: “Understand the time frames and way to change mind after signing consent (Days 1-5)” and “Understand that should I desire to revoke my consent for adoption on Days 6-14, I must go before the Probate Judge, who will then make a determination of whether or not to accept my revocation.” The birth mother initialed each statement, then signed the form at the bottom of the page.
The birth mother argues that the form provided by Waller did not give her proper notice of the withdrawal provision of § 26-10A-13(b) because it did not mention anything about the best-interest-of-the-child standard that would be applied during the days 6-14 withdrawal period. However, as previously discussed, the birth mother testified that Judge Gaines had told her about the best-interest standard during the prebirth-consent hearing.
The birth mother further testified that the two periods for withdrawing her consent had been explained to her several times. She stated that she withdrew her consent within 14 days after the birth of the child and that she did that because she knew there was a deadline. She testified that she knew that she would not have had to come to court if she had withdrawn her consent within five days after the child was born.
In light of the testimony of the birth mother and the findings of the probate court, we conclude that the evidence supports the probate court’s finding that Judge Gaines strictly adhered to § 26-10A-12 by explaining to the birth mother “the legal effect of signing the document and the time limits and procedures for withdrawal of the consent.” § 26-10A-12.
“The hallmarks of procedural due process are notice and ‘the opportunity to be heard “at a meaningful time and in a meaningful manner.” ’ ” Alabama Republican Party v. McGinley, 893 So.2d 337, 344 (Ala.2004)(quoting Mathews v. Eldridge, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), quoting in turn Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)).
The birth mother argues that her entire prebirth-consent form is invalid because the form failed to state, in writing, the provisions of § 26-10A-13(b), even though the birth mother testified that she had actual notice of the withdrawal provisions and the best-interest standard found in § 26-10A-13(b). Based on these facts, we conclude that § 26-10A-12 of the Adoption Code is not unconstitutional, as applied to the birth mother in this case, because, according to her own testimony, she had actual notice of the procedures for withdrawing her consent. The birth mother has taken advantage of her due-process rights by acting on her actual notice and withdrawing her consent to adoption within 14 days following the birth of the child; also, in furtherance of her due-process rights, the probate court provided the birth mother with a full opportunity to be heard on her petition to withdraw her consent and her adoption-contest petition. Due process guarantees no further protection. See Ex parte Jackson, 881 So.2d 450, 453 (Ala.2003) (“Due process requires notice and a hearing.”).
The final order of the probate court stated that the attorney for the adoptive parents, Bryant A. Whitmire, Jr., explained § 26-10A-13 and the best-interest standard to the birth mother before the consent hearing. Because Whitmire rep *493 resented the adoptive parents throughout the adoption proceedings, including the birth mother’s adoption contest, we do not have the benefit of his testimony on the record. The briefs of the parties do not direct this court to any place in the record that confirms that Whitmire explained the best-interest standard to the birth mother before the consent hearing.
We conclude that the evidence does not support the probate court’s finding that Whitmire explained the best-interest standard to the birth mother before the consent hearing. However, that finding does not affect the outcome of this appeal because, as we explained above, we conclude that the birth mother was nonetheless aware of all the withdrawal provisions found in § 26-10A-13.

B.Failure to Appoint a GAL on Behalf of the Birth Mother

After a review of the record, we do not find anywhere in the record where this issue was presented to the probate court. The birth mother did not raise this issue in her adoption-contest petition or in her amended contest petition, and the probate court did not rule on this issue in its final order. See Norman v. Bozeman, 605 So.2d 1210, 1214 (Ala.1992) (“Our review is limited to the issues that were before the trial court—an issue raised on appeal must have first been presented to and ruled on by the trial court.”).
‘“We cannot put a trial court in error for failure to rule on a matter which, according to the record, was not presented to, nor decided by him ....’” Kyser v. Harrison, 908 So.2d 914, 918 (Ala.2005) (quoting Before v. Bourjois, Inc., 268 Ala. 228, 230, 105 So.2d 846, 848 (1958)). We conclude that the probate court did not commit error in failing to appoint a GAL on behalf of the birth mother.

C.Fraud, Duress, Mistake, or Undue Influence

Section 26-10A-14, Ala.Code 1975, sets forth the time limitations for withdrawing a signed consent-for-adoption form, as follows:
“a) The consent or relinquishment, once signed or confirmed, may not be withdrawn except:
“(1) As provided in Section 26-10A-13; or
“(2) At any time until the final decree upon a showing that the consent or relinquishment was obtained by fraud, duress, mistake, or undue influence on the part of a petitioner or his agent or the agency to whom or for whose benefit it was given.”
In her adoption-contest petition, the birth mother alleged that the adoptive parents personally, or through their agent, R.S., committed acts of fraud, duress, mistake, or undue influence in order to obtain her consent for adoption. On appeal, the birth mother alleges 15 specific examples of fraud, duress, or undue influence committed by the adoptive parents or R.S.[7] However, since we are affirming the probate court’s finding that R.S. was not the agent of the adoptive parents (see section II., infra), we review only the claims of fraud, duress, and undue influence alleged by the birth mother on the part of the adoptive parents. In doing so, we keep the attendant presumption that, because the evidence was heard ore tenus, the probate court’s findings are presumed correct. *494 K.P. v. G.C., 870 So.2d 751, 757 (Ala.Civ.App.2003).[8]
First, the birth mother alleges that the adoptive father agreed to pay for the birth mother’s college education if she went through with the adoption. Although the birth mother stated that R.S. told her that the adoptive father would probably pay for her education if she went through with the adoption, the adoptive father testified that he did not recall agreeing to pay for the birth mother’s education and did not recall discussing the matter with R.S. R.S. also denied that the adoptive parents had ever said that they would pay for the birth mother’s education after the adoption went through.
Next, the birth mother argues that she felt “controlled” by the fact that the adoptive parents mailed the court-approved support payment to R.S., who then paid the birth mother’s expenses and gave the remaining amount to the birth mother as an allowance. R.S. testified that the birth mother’s mother put together a “starter kit” for him that contained all the birth mother’s bills that could be paid for by the court-approved support from the adoptive parents; some of the bills were already overdue, including the bill for the birth mother’s cellular telephone, which had been turned off. R.S. also testified that the payments from the adoptive parents on behalf of the birth mother were sent to him, at his private post office box, to protect the identity of the adoptive parents. R.S. gave the birth mother’s counsel a spreadsheet that accounted for “every penny” of the money sent to R.S. by the adoptive parents on behalf of the birth mother, to the satisfaction of the birth mother’s counsel.
The birth mother further argues that she suffered “pressures” at the hospital from the adoptive parents when she delivered the child. The birth mother insisted on handing the child directly to the adoptive parents at the hospital, despite their desire for confidentiality. Two days after the birth of the child the adoptive parents came to the hospital to take custody of the child; the birth mother testified that she was very emotional during this encounter. The birth mother further testified that she and the adoptive mother decided what outfit the child would wear and that anything said between the parties was very brief. The adoptive mother testified that when she and the adoptive father arrived at the birth mother’s hospital room, everyone was very emotional. She stated that she and her husband left the room for a short period so that the birth mother “could have a little bit more time with her mom.” The adoptive parents returned to the birth mother’s room after a nurse called them in; the birth mother handed the child to the adoptive mother, and, as they were leaving, the adoptive mother recalled the birth mother saying “thank you.” This event took place after the birth mother had signed the consent-for-adoption form, and it is unclear how it affected her decision to sign the prebirth-consent form three months earlier.
The birth mother also states that the number of telephone communications between R.S. and the adoptive parents, including a time of prayer together, is evidence of fraud, duress, or undue influence. The amount of communication between the adoptive parents and R.S. throughout the pregnancy in and of itself is not an example of fraud, duress, or undue influence. *495 The testimony cited by the birth mother is of R.S. and the adoptive parents failing to recollect the specifics of their conversations; these are not examples of fraud, duress, or undue influence. The birth mother also points out that the adoptive parents provided lunch for R.S. and had a time of prayer with R.S. at some point during her pregnancy, but she fails to show how these circumstances amounted to fraud, duress, or undue influence on her.
Finally, the birth mother argues that the adoptive parents’ delay in taking the child to their home was “in recognition of [the birth mother’s] tentativeness.” The testimony of both of the adoptive parents was that they left the child with the adoptive father’s parents for several days after they took custody of the child because they knew that the birth mother had the absolute right to withdraw her consent to the adoption at any time during the five days following the birth of the child. They testified that it was to “protect their heart,” not because they knew that the birth mother was feeling tentative about going through with the adoption. Regardless, it is unclear how this act of the adoptive parents, which occurred after the birth mother had given her consent to the adoption some three months earlier, is an example of fraud, duress, or undue influence on the birth mother.
We note that the birth mother’s brief cites a single ease, Roper v. Lenoir, 243 Ala. 583, 11 So.2d 361 (1943), to support her assertion that the above-alleged “facts” are actually examples of fraud, duress, or undue influence. In that case, the appellant, a widow, wanted to cancel a deed in which she had gifted real estate to her nieces. The widow alleged that her attorney, who drew up the deed, had unduly influenced her; however, in holding that the attorney had not unduly influenced her, the court found that the attorney had acted under the widow’s orders, that his advice regarding the deed had not been sought or given, and that the widow had full knowledge of the transaction. The birth mother cites this case for the following statement:
“It is not essential that the grantees should have personally had any connection with the transaction. If another, standing in confidential relation to the grantor in position to exert a dominant influence, employs such influence in behalf of another, however innocent, the result is the same, where the grantee parts with nothing, as in case of a gift.”
243 Ala. at 584,11 So.2d at 362.
This statement would seem to support an argument that the acts of R.S., as an agent of the adoptive parents, could be attributable to the adoptive parents. However, it does not support an argument that, in the above instances, the adoptive parents exerted fraud, duress, or undue influence on the birth mother. We conclude that the record supports the dismissal of the birth mother’s adoption contest and the finding of the probate court “that undue influence was not manifested by [R.S.] or by any other person.”
II. Agency of R.S.
In her adoption contest, the birth mother alleged that R.S. and his family “provided for me shelter and sustenance during my pregnancy in exchange for placing my child for adoption” with the adoptive parents. She further stated that R.S. and his family “acted at all times on behalf of the prospective adoptive parents and acted to influence [the birth mother’s] action in favor of adoption.” She also stated in her petition that she “was at a loss of what to do, and I was made to feel that I had no other option but to place my child for adoption, or I would incur the ill will and disfavor of [R.S. and his family] and the adoptive couple and all their friends.”
*496 The probate court found that, “regarding the agency contention, ... [R.S.] was not working on behalf of anybody,” and it further noted that “no other person or groups of persons were involved in any agency relationship in any way.” The only authority the birth mother cites to support her agency argument is Roper v. Lenoir, supra, as discussed above. Assuming R.S. was in a “confidential relationship] with the birth mother,” as discussed in Roper, 243 Ala. at 584, 11 So.2d at 362, the evidence does not indicate that he used that position to exert influence on the birth mother on behalf of the adoptive parents.
The evidence presented in the record supports the probate court’s finding that R.S. was not the agent of the adoptive parents. The record reveals that the adoptive parents saw R.S. as a representative of the birth mother and her family. The probate court specifically found that R.S. and his family were long-time friends of the birth mother and her family. The birth mother’s father and R.S. were “best friends,” and their families had been on vacations together to the beach and to Disney World.
The record indicates that R.S. first attempted to arrange for the birth mother to live with other friends but that, when that fell through, he offered his own home to the birth mother. We further note that the adoptive parents did not know R.S. before he contacted the adoptive father’s mother about the possible adoption.
The adoptive parents argue that “there is no citation to authority which would establish that any of the actions or inac-tions of R.S. and the adoptive parents indicate an agency relationship under Alabama law ....” We agree; the record supports the trial court’s finding that R.S. was not the agent of the adoptive parents and that he “was only trying to be helpful in the face of less than the best of circumstances.”
III. Visitation
The birth mother argues that the probate court erred when it found that it did not have authority under the Adoption Code to grant visitation with the child to the birth mother. The birth mother concedes that the Adoption Code does not expressly grant visitation rights to a natural mother during the pendency of an adoption contest.
The birth mother directs this court to § 26-10A-30, Ala.Code 1975, which grants visitation rights to the natural grandparents of an adoptee in a situation when “the adoptee is adopted by a stepparent, a grandfather, a grandmother, a brother, a half-brother, a sister, a half-sister, an aunt or an uncle and their respective spouses, if any.” The visitation rights may be granted “prior to or after the final order of adoption is entered .... ” § 26-10A-30. The birth mother argues that the probate court possesses equitable powers, but she cites no authority to support her implied assumption that this court can create visitation rights for a natural mother during a contested adoption proceeding when such rights were not prescribed by our legislature.
When the birth mother signed the pre-birth-consent form, she stated: “I understand that by signing this document and the subsequent court order to ratify the consent, I will forfeit all rights and obligations to [the child] ....”
This court has held that “ ‘[b]ecause adoption is strictly statutory and involves the curtailment of the fundamental rights of the natural parents, the adoption statute[s] must be closely adhered to.’ ” Shelley v. Nowlin, 494 So.2d 453, 455 (Ala.Civ. App.1986) (quoting Vice v. May, 441 So.2d 942 (Ala.Civ.App.1983), citing in turn *497 Davis v. Turner, 337 So.2d 355 (Ala.Civ.App.1976)).
Further, “[i]t is not proper for a court to read into [a] statute something which the legislature did not include although it could have easily done so.” Noonan v. East-West Beltline, Inc., 487 So.2d 237, 239 (Ala.1986). If the legislature had intended to allow visitation between a birth mother and a child who is the subject of an adoption-contest proceeding, it could have provided for such visitation. Since the legislature has specifically granted visitation privileges, in certain circumstances, to certain family members of the adoptee’s natural family it is clear that the legislature considered visitation privileges for members of an adoptee’s natural family; apparently, however, it did not see fit to expand that privilege to the natural parents of the adoptee who have voluntarily consented to “forfeit all rights and obligations” to their child. See Ex parte Jackson, 614 So.2d 405, 407 (Ala.1993) (stating that the legislature “knew how to draft a statute to reach” a desired end and that “[t]he judiciary will not add that which the Legislature chose to omit”).
Therefore, we decline to hold the probate court in error for denying the birth mother’s request for visitation with the child during the pendency of the adoption contest.
IV. Gifts from the Adoptive Parents
The birth mother argues that “the gifts, money, notes, and influence from [R.S.] on behalf of the adoptive [parents] confused her feelings and made her feel obligated to go through with the adoption.” The birth mother argues that the adoptive parents signed an affidavit swearing that they “paid no money or other things of value to any party in connection with this adoption proceeding except that which has been approved by the Court” but that they then failed to disclose certain gifts that the adoptive parents had given to the birth mother during her pregnancy. In her brief, the birth mother calls this a “blatant omission” and evidence of the adoptive parents’ true intention to exert influence over the birth mother. However, the birth mother fails to address the corresponding affidavit that she signed, swearing that she had “received no money or other things of value ... for giving the said minor up for adoption.”
The probate court found that the gifts given to the birth mother by the adoptive mother were valued at approximately $112; the gifts included items such as candy, lotion, a candle, and flowers sent to the birth mother when she was in the hospital. The probate court found that “[t]he adoptive mother was merely attempting to be kind and supportive during the pregnancy, nothing more.” The evidence supports the probate court’s findings. The adoptive mother testified that she was raised to express appreciation by giving small gifts, and both of the adoptive parents testified that they did not consider the gifts to be of any monetary value, which is why they signed the affidavit swearing that they had not given anything of value to the birth mother.
In light of the mandates of the ore tenus rule, we assume that the findings of the probate court are correct if they are supported by the evidence. Meadows v. Meadows, 3 So.3d 221, 227 (Ala.Civ.App.2008). We conclude that the probate court did not err in finding that the small tokens of appreciation from the adoptive mother to the birth mother were not an attempt by the adoptive parents to influence the birth mother to consent to adoption.
V. The Testimony of Dr. Tumbow
Dr. Turnbow testified regarding bonding and separation issues of a hypothetical child that is the same age as the *498 child in this case. She stated that, once a child attaches to its primary caregiver, the child would have a painful emotional response to being removed from its primary caregiver, even if the child was only 16 months old.
The birth mother argues that the probate court erred in allowing this testimony. In support of her argument, the birth mother cites Justice See’s concurring opinion in Ex parte C.V., 810 So.2d 700 (Ala.2001). Justice See stated that the child in question “ha[d] been in the custody of the prospective adoptive parents since shortly after his birth; that fact alone, however, does not provide a sufficient basis for terminating C.V.’s parental rights.” 810 So.2d at 704. The adoptive parents argue that the birth mother did not properly preserve this issue for appeal. We agree.
The birth mother filed a motion to exclude the testimony of Dr. Turnbow on April 7, 2008, approximately two weeks before the first hearing on the birth mother’s withdrawal of consent and adoption contest. In that motion, the birth mother alleged that Ex parte C.V. supported exclusion of Dr. Turnbow’s testimony because Dr. Turnbow was going to testify regarding separation and bonding issues between a child and its primary caregiver. The probate court denied the birth mother’s motion on April 11, 2008. At the subsequent hearing, Dr. Turnbow testified regarding separation and bonding issues without objection from the birth mother; further, counsel for the birth mother cross-examined Dr. Turnbow and asked several hypothetical questions regarding bonding and separation issues.
A “motion in limine” is defined by Black’s Law Dictionary 1038 (8th ed.2004) as “[a] pretrial request that certain inadmissible evidence not be referred to or offered at trial.” Although the birth mother’s pretrial motion to exclude Dr. Turn-bow’s testimony was not styled as such, we view the motion as a motion in limine. See Evans v. Waddell, 689 So.2d 23, 26 (Ala.1997) (“The substance of a motion and not its style determines what kind of motion it is.”). In Bolden v. Lang, 695 So.2d 54, 57 (Ala.Civ.App.1997), this court, quoting Parks v. State, 587 So.2d 1012, 1015 (Ala.1991), stated
“that in order to preserve the issue for appeal, the party who suffers an adverse ruling on a motion in limine must take some action at trial (whether it is to proffer the excluded evidence or to object to the proffered evidence and assign grounds) ‘unless he or she obtains the express acquiescence of the trial judge that a subsequent [proffer of the excluded evidence or] objection and assignment of grounds are not necessary.’ ”
Because the birth mother did not object to Dr. Turnbow’s testimony regarding separation and bonding issues at the hearing and because the record does not reflect that the birth mother obtained the “express acquiescence of the trial judge that subsequent objection and assignment of grounds [were] not necessary,” we conclude that the admission of Dr. Turnbow’s testimony has not been properly preserved for appeal.
The birth mother also mentions, in a heading in her brief to this court, that “Dr. Turnbow testified that [the birth mother] was not fit based upon her past medical psychological records, never having interviewed [the birth mother].” The birth mother offers no further argument and cites no authority in support of this claim. That is a violation of Rule 28(a)(10), Ala. R.App. P., because the birth mother fails to present “[a]n argument containing the contentions of the appellant ... with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and part of the *499 record relied on.” Therefore, we will not consider this issue. See Moulton v. Moulton, 528 So.2d 887, 338 (Ala.Civ.App.1988) (“While an evidence question was also mentioned in the issue which was presented for our decision, that evidence problem was not argued and no citation of authority pertaining thereto was presented in the brief on appeal. Consequently, we cannot consider that evidence aspect.”).
This court is not without sympathy for a natural parent who changes his or her mind about giving their child up for adoption. However, “[a] natural parent’s mere change of mind cannot justify a rescission of the natural parent’s consent to an adoption provided the natural parent gave an informed, intelligent consent and all of the procedural safeguards were followed.” Good v. Zavala, 531 So.2d 909, 910 (Ala.Civ.App.1988) (citing Ex parte Nice, 429 So.2d 265 (Ala.1982)). The order of the probate court is due to be affirmed.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, THOMAS, and MOORE, JJ., concur.

. The biological father of the child also signed a consent-for-adoption form, which was identical to the form the birth mother signed. The biological father did not withdraw his consent for adoption, and he is not a party to this action.

. On July 21, 2006, the probate court approved the adoptive parents’ request to provide support to the birth mother in the amount of $798 a month; this amount was to cover the birth mother’s living expenses, such as transportation, utilities, food, and clothing.

. Although Judge Gaines presided over the prebirth-consent hearing, Judge Alan L. King, also a probate judge in Jefferson County, presided over all subsequent proceedings in this case.

. Section 26-10A-24 states, in pertinent part:
"(a) Whenever a motion contesting the adoption is filed, the court shall set the matter for a contested hearing to determine:
"(1) Whether the best interests of the adoptee will be served by the adoption.
“(2) Whether the adoptee is a person capable of being adopted by the petitioner in accordance with the requirements of this chapter.
"(3) Whether an actual or implied consent or relinquishment to the adoption is valid.
“(4) Whether a consent or relinquishment may be withdrawn.”

.The amended adoption-contest petition also alleged that the birth mother’s constitutional rights under the Fifth and Sixth amendments to the United States Constitution had been violated. However, the birth mother’s brief to this court does not address a constitutional argument regarding the Fifth and Sixth amendments; therefore, those issues are *486 waived on appeal. Ex parte Riley, 464 So.2d 92, 94 (Ala.1985) ("[The] failure to argue an issue in brief to an appellate court is tantamount to the waiver of that issue on appeal.”).

. The probate court, in its final order, held that § 26-10A-12 and § 26-10A-13 were not unconstitutional, and the birth mother appeals that holding. However, after reviewing the record, we note that the birth mother only challenged § 26-10A-12 as unconstitutional in her pleadings before the probate court. Further, the mother makes no argument in her brief to this court that § 26-10A-13 is unconstitutional; therefore, she has waived that issue. See Ex parte Riley, note 5, supra.

. On appeal, the birth mother does not allege that any of the specific instances listed are examples of mistake.

. Although we address the argument made by the birth mother regarding the allegations of fraud, duress, and undue influence, we note that the birth mother failed to provide a cogent argument in her brief to this court as to how the 15 specific situations she cites are examples of fraud, duress, or undue influence on the birth mother.